UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| WILLIAM H. BEST, | No. EDCV 03-1241-RC |
| Plaintiff, | |
| v. | OPINION AND ORDER |
| MICHAEL J. ASTRUE,[1] Commissioner of Social Security, | |
| Defendant. | |

Plaintiff William H. Best filed a complaint on October 30, 2003, seeking review of the Commissioner's decision denying his applications for disability benefits. The Commissioner answered the complaint on September 18, 2007, and the parties filed a joint stipulation on November 6, 2007.

**BACKGROUND**

**I**

On November 10, 1997, plaintiff applied for disability benefits under both Title II of the Social Security Act ("Act"), 42 U.S.C. §

---

[1] Pursuant to Fed. R. Civ. P. 25(d)(1), Michael J. Astrue is substituted as the defendant in the action.

423, and the Supplemental Security Income program ("SSI") of Title XVI of the Act, 42 U.S.C. § 1382(a), claiming an inability to work since July 1, 1997, due to a herniated disc.  Certified Administrative Record ("A.R.") 66-68, 74, 198-200.  The plaintiff's applications were initially denied on February 23, 1998, and were denied again on April 30, 1998, following reconsideration.  A.R. 55-65.  The plaintiff then requested an administrative hearing, which was held before Administrative Law Judge F. Keith Varni ("ALJ Varni") on November 16, 1998.  A.R. 24, 27-52, 324-25, 343-68.  On January 26, 1999, ALJ Varni issued a decision finding plaintiff is not disabled.  A.R. 10-18, 308-16.  The plaintiff appealed this decision to the Appeals Council, which denied review on April 5, 2000.  A.R. 5-9, 203-04, 331-37.

On June 19, 2000, plaintiff filed a complaint seeking review of the Commissioner's decision, <u>Best v. Apfel</u>, CV 00-6259-CAS(RC) ("Best I"), and on January 25, 2001, pursuant to the parties' stipulation, Judgment was entered remanding Best I to the Commissioner for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g).  A.R. 216-20, 338-42.  On February 28, 2001, the Appeals Council remanded Best I for a new administrative hearing, A.R. 214-15, 369-70, which was held on May 31, 2001, before ALJ Varni.  A.R. 221-34, 378-91.  On June 27, 2001, ALJ Varni issued a decision again finding plaintiff is not disabled.  A.R. 205-11, 317-23.

On August 31, 2001, plaintiff filed another complaint seeking review of the Commissioner's decision, <u>Best v. Massanari</u>, CV 01-0629-CAS(RC) ("Best II"), and on June 27, 2002, pursuant to the parties' stipulation, Judgment was entered remanding Best II to the

1  Commissioner for further proceedings pursuant to sentence four of 42
2  U.S.C. § 405(g).  A.R. 371-76.  On January 8, 2003, the Appeals
3  Council remanded Best II for a new administrative hearing, A.R. 392-
4  94, which was held on May 6 and July 30, 2003, before Administrative
5  Law Judge Mason D. Harrell, Jr. ("the ALJ").  A.R. 267-307.  On
6  August 29, 2003, the ALJ issued a partially favorable decision,
7  finding plaintiff has been disabled since July 31, 2002, and awarded
8  him SSI benefits.  A.R. 246-57.  The ALJ also found plaintiff was not
9  entitled to Title II benefits since his date last insured was
10 December 31, 2001, and he was not disabled until July 31, 2002.  A.R.
11 256-57.

13     On October 30, 2003, plaintiff filed the pending complaint
14 seeking review of the Commissioner's partial denial of disability
15 benefits to him, and on January 9, 2004, pursuant to the parties'
16 stipulation, the matter was remanded to the Commissioner for further
17 administrative proceedings pursuant to sentence six of 42 U.S.C. §
18 405(g).  A.R. 488-90.  On August 8, 2006, the Appeals Council remanded
19 this matter to the ALJ for a de novo hearing, A.R. 484-87, which was
20 held on November 29, 2006, A.R. 491-502, and on February 23, 2007, the
21 ALJ issued a decision reaffirming plaintiff was not disabled before
22 July 31, 2002.  A.R. 467-76.  On June 19, 2007, this Court granted the
23 parties' request to reopen this matter.

**II**

26     The plaintiff, who was born on April 17, 1945, is currently 63
27 years old.  A.R. 66, 198.  He has an eighth-grade education and has
28 previously worked as a security guard, mover/packer, a gas station

3

attendant, and a machinist.  A.R. 78, 80-85, 405, 413-20.

The plaintiff initially injured his lower back at work on December 18, 1986, and reinjured it on March 31, 1987.  A.R. 111-12, 129-30.  George S. Watkin, M.D., an orthopedic surgeon, examined plaintiff on December 17, 1987, and May 5, 1989, and diagnosed plaintiff with a left-sided herniated nucleus pulposus,[2] L4-L5, a mild disc bulge at L5-S1, and degenerative disc disease at L3-L4.  A.R. 103-06.

On March 24, 1988, Martin J. Morris, M.D., an orthopedic surgeon, examined plaintiff, diagnosed him with lumbar spine discogenic disease and residuals of a low back musculoligamentous strain, and opined plaintiff was prophylactically precluded from performing very heavy work.[3]  A.R. 129-39.  Lumbar spine x-rays showed narrowing of the L5-S1 interspace with the remaining disc spaces well maintained.  A.R.

---

[2]  A nucleus pulposus is "a semifluid mass of fine white and elastic fibers that forms the central portion of an intervertebral disk. . . ."  Dorland's Illustrated Medical Dictionary, 1243 (29th ed. 2000).

[3]  Dr. Morris evaluated plaintiff for California workers' compensation purposes, and his opinion uses different terminology than is used in evaluating the disability of a Social Security claimant.  Desrosiers v. Sec. of Health & Human Serv., 846 F.2d 573, 576 (9th Cir. 1988); Payan v. Chater, 959 F. Supp. 1197, 1202-03 (C.D. Cal. 1996).  Under the California's workers' compensation guidelines then in effect, a disability precluding "very heavy work" contemplated that the claimant "ha[d] lost approximately one-quarter of his pre-injury capacity for performing such activities as bending, stooping, lifting, pushing, pulling and climbing or other activities involving comparable physical effort."  Schedule for Rating Permanent Disabilities, Guidelines For Work Capacity, 1-A (July 1988).

4

1  134.  On June 28, 1989, Dr. Morris reevaluated plaintiff, diagnosed
2  him with lumbar spine discogenic disease with a herniated lumbar disc
3  and residuals of a low back musculoligamentous strain, and opined
4  plaintiff remained prophylactically precluded from performing very
5  heavy work.  A.R. 118-28.  A lumbar spine MRI showed a central 6-mm.
6  disc herniation at L5-S1 with mild impression upon the thecal sac, a
7  5-mm. central disc herniation at L4-L5 with mild impression on the
8  thecal sac, slight asymmetry of the descending L5 nerve roots, left
9  being larger than right, which might be related to mild left nerve
10 root edema, and disc desiccation changes at L3-L4, which might be
11 related to bony edema changes and bony trauma.  A.R. 124.  Dr. Morris
12 opined plaintiff is a suitable candidate for a percutaneous lumbar
13 discectomy and, if that failed, a lumbar laminectomy and discectomy.
14 A.R. 127.  On October 10, 1989, Dr. Morris found plaintiff could not
15 return to his former occupation as a furniture mover.  A.R. 113.

17     Eight years later, on October 24, 1997, Andre Blaylock, M.D.,
18 examined plaintiff, diagnosed him with low back pain secondary to disc
19 herniation, rule out radiculopathy,[4] and possible alcohol abuse, and
20 ordered further testing.  A.R. 162.  On November 17, 1997, plaintiff
21 underwent a lumbar spine CT Scan, which showed vacuum disc phenomenon
22 at L3-L4, L4-L5 and L5-S1, mild diffuse disc bulging at L3-L4 and L4-
23 L5, mild diffuse disc bulging associated with facet hypertrophy,[5] and

---

[4] Radiculopathy is "disease of the nerve roots."  Dorland's Illustrated Medical Dictionary at 1511.

[5] Hypertrophy is "the enlargement or overgrowth of an organ or part due to an increase in size of its constituent cells." Dorland's Illustrated Medical Dictionary at 859.

5

disc space narrowing at L5-S1.  A.R. 168, 241.  Lumbar spine x-rays taken the same day showed findings consistent with L5-S1 degenerative disc disease.  A.R. 167, 240.  Electromyographic and nerve conduction studies obtained January 2, 1998, were normal.  A.R. 159-60, 242-43.

On January 10, 1998, Harpreet Sekhon, M.D., an internist, examined plaintiff and opined plaintiff can lift and carry 20 pounds occasionally and 10 pounds frequently, can stand or walk for 2-4 hours with a break every 2 hours, and can sit continuously for 6 hours with a break every 2 hours.  A.R. 143-45, 170-72.

On February 17, 1998, nonexamining physician John R. Ford, M.D., opined plaintiff can occasionally lift and/or carry 20 pounds, climb ramps or stairs, balance, stoop, kneel, crouch, or crawl, frequently lift and/or carry 10 pounds, can sit, stand and/or walk for approximately 6 hours in an 8-hour workday, should avoid even moderate exposure to extreme cold and hazards, and can never climb ladders, ropes, or scaffolds.  A.R. 149-56.  Dr. Ford further opined there is no evidence plaintiff's impairment would interfere with his physical capacity to perform light basic work activities.  A.R. 156.  On April 29, 1998, nonexamining physician Leonard H. Naiman, M.D., similarly opined plaintiff can occasionally lift and/or carry 20 pounds, climb, stoop, kneel, crouch, or crawl, frequently lift and/or carry 10 pounds, can sit, stand and/or walk for approximately 6 hours in an 8-hour workday, should avoid even moderate exposure to extreme cold and hazards and can never balance, and also opined plaintiff is limited in his ability to push or pull with his lower extremities. A.R. 183-91.  Dr. Naiman further stated "there would be no continuous

twelve month period during which this individual could not have tolerated at the least a light level of activity." A.R. 191.

Between September 4, 2001, and February 5, 2003, plaintiff received treatment at the Arrowhead Regional Medical Center, where he was diagnosed with low back pain and lumbar radiculopathy, a herniated disc, knee osteoarthritis, arthritis, and vitamin B12 and folate deficiencies secondary to alcoholism, among other conditions. A.R. 428-39, 450-61. A lumbosacral spine MRI taken December 5, 2002, revealed advanced degenerative disc disease, most pronounced at L3-L4 and L5-S1 with moderate-to-severe bilateral neural foraminal narrowing at L5-S1 and on the left side of L4-L5 from a large paracentral disc spur, but no significant spinal stenosis. A.R. 451.

On May 6, 2003, medical expert Samuel Landau, M.D., testified at plaintiff's third administrative hearing that plaintiff has lumbosacral spine degenerative disc disease and back pain, osteoarthritis of the knees with pain, and alcohol abuse, and these conditions do not meet or equal a listed impairment. A.R. 272-75. Dr. Landau opined plaintiff can lift and carry 20 pounds occasionally and 10 pounds frequently, stand and walk for 2 hours in an 8-hour day, and sit for 6 hours in an 8-hour day with normal breaks and a sit/stand option, and he can occasionally bend and stoop; however, he cannot climb, balance, work at heights, work around unprotected machinery, kneel or crawl, or operate motorized equipment. A.R. 272. Dr. Landau concluded that if plaintiff did not abuse alcohol, he would not be restricted from operating motorized equipment. A.R. 275.
//

1    On June 6, 2003, Dr. Blaylock opined plaintiff can frequently
2 lift and carry up to 10 pounds, can sit for approximately 2 hours in
3 an 8-hour day and stand and/or walk for less than 2 hours in an 8-hour
4 day, can sit for approximately 45 minutes and stand for approximately
5 30 minutes before having to change positions, and can never stoop,
6 crouch, or climb stairs or ladders.  A.R. 462-64.  Dr. Blaylock also
7 opined plaintiff must walk for 20 minutes each 45 minutes, must be
8 able to shift positions at will from sitting to standing/walking, will
9 need to lie down 2-3 times a day at unpredictable intervals during an
10 8-hour day, and his ability to reach, finger, and push/pull are
11 affected by his impairment.  A.R. 463-64.  Dr. Blaylock concluded
12 plaintiff's condition would cause plaintiff to miss about three days
13 of work a month.  A.R. 464.

15    On November 13, 2006, an unidentified physician opined plaintiff:
16 can occasionally lift and carry up to 10 pounds and stoop, and
17 frequently lift and carry less than 10 pounds; can sit, stand and/or
18 walk for less than 2 hours in an 8-hour day; can sit for approximately
19 15 minutes and stand for approximately 15 minutes before having to
20 change positions; must walk for 10 minutes every 15 minutes; needs to
21 shift positions at will from sitting to standing/walking; will need to
22 lie down 3-4 times at unpredictable intervals during a work shift; can
23 never twist, crouch, or climb stairs or ladders; has an impairment in
24 his ability to feel and push/pull; and must avoid all exposure to
25 extreme cold and hazards.  A.R. 506-08.  The physician concluded
26 plaintiff would miss more than three days of work a month due to his
27 condition.  A.R. 508.
28 //

**DISCUSSION**

**III**

The Court, pursuant to 42 U.S.C. § 405(g), has the authority to review the Commissioner's decision denying plaintiff disability benefits to determine if his findings are supported by substantial evidence and whether the Commissioner used the proper legal standards in reaching his decision. Ryan v. Comm'r of Soc. Sec., 528 F.3d 1194, 1198 (9th Cir. 2008); Lingenfelter v. Astrue, 504 F.3d 1028, 1035 (9th Cir. 2007).

"In determining whether the Commissioner's findings are supported by substantial evidence, [this Court] must review the administrative record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." Reddick v. Chater, 157 F.3d 715, 720 (9th Cir. 1998); Holohan v. Massanari, 246 F.3d 1195, 1201 (9th Cir. 2001). "Where the evidence can reasonably support either affirming or reversing the decision, [this Court] may not substitute [its] judgment for that of the Commissioner." Parra v. Astrue, 481 F.3d 742, 746 (9th Cir. 2007), cert. denied, 128 S. Ct. 1068 (2008); Lingenfelter, 504 F.3d at 1035.

The claimant is "disabled" for the purpose of receiving benefits under the Act if he is unable to engage in any substantial gainful activity due to an impairment which has lasted, or is expected to last, for a continuous period of at least twelve months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); 20 C.F.R. §§ 404.1505(a), 416.905(a). "The claimant bears the burden of establishing a prima facie case of disability." Roberts v. Shalala, 66 F.3d 179, 182 (9th Cir. 1995),

cert. denied, 517 U.S. 1122 (1996); Smolen v. Chater, 80 F.3d 1273, 1289 (9th Cir. 1996). Since plaintiff's disability insured status for Title II purposes expired on December 31, 2001, plaintiff must show he was either permanently disabled or subject to a condition which became so severe as to disable him prior to that date.[6] Tidwell v. Apfel, 161 F.3d 599, 601 (9th Cir. 1998); Armstrong v. Comm'r of the Soc. Sec. Admin., 160 F.3d 587, 589 (9th Cir. 1998).

The Commissioner has promulgated regulations establishing a five-step sequential evaluation process for the ALJ to follow in a disability case. 20 C.F.R. §§ 404.1520, 416.920. In the **First Step**, the ALJ must determine whether the claimant is currently engaged in substantial gainful activity. 20 C.F.R. §§ 404.1520(b), 416.920(b). If not, in the **Second Step**, the ALJ must determine whether the claimant has a severe impairment or combination of impairments significantly limiting him from performing basic work activities. 20 C.F.R. §§ 404.1520(c), 416.920(c). If so, in the **Third Step**, the ALJ must determine whether the claimant has an impairment or combination of impairments that meets or equals the requirements of the Listing of Impairments ("Listing"), 20 C.F.R. § 404, Subpart P, App. 1. 20 C.F.R. §§ 404.1520(d), 416.920(d). If not, in the **Fourth Step**, the ALJ must determine whether the claimant has sufficient residual functional capacity despite the impairment or various limitations to

---

[6] The plaintiff does not challenge the ALJ's determination that he last met the Title II disability insured status requirements on December 31, 2001. Nevertheless, because the ALJ previously found plaintiff disabled since July 31, 2002, and not before, and because plaintiff applied for SSI benefits in 1997, the ALJ also addressed whether plaintiff was disabled for SSI purposes prior to July 31, 2002.

1  perform his past work.  20 C.F.R. §§ 404.1520(f), 416.920(f).  If not,
2  in **Step Five**, the burden shifts to the Commissioner to show the
3  claimant can perform other work that exists in significant numbers in
4  the national economy.  20 C.F.R. §§ 404.1520(g), 416.920(g).

6      Applying the five-step sequential evaluation process, the ALJ
7  found plaintiff "engaged in substantial gainful activity as a security
8  guard at least from November 1, 1999 to July 31, 2001, but he has not
9  engaged in substantial gainful activity at any time since then[.]"
10 (Step One).  The ALJ then found that prior to July 31, 2002, plaintiff
11 "had the following severe combination of impairments: degenerative
12 disc disease of the lumbar spine, degenerative arthritis of the knees,
13 chronic alcohol abuse, and probable alcohol dependence" (Step Two);
14 however, plaintiff does not have an impairment or combination of
15 impairments that meets or equals a Listing.  (Step Three).  The ALJ
16 next determined plaintiff could not perform his past relevant work as
17 a packer, furniture mover or security guard prior to July 31, 2002.
18 (Step Four).  Finally, the ALJ concluded that, prior to July 31, 2002,
19 plaintiff could perform a significant number of jobs in the national
20 economy; therefore, he was not disabled at that time.  (Step Five).

**IV**

23     A claimant's residual functional capacity ("RFC") is what he can
24 still do despite his physical, mental, nonexertional, and other
25 limitations.  Mayes v. Massanari, 276 F.3d 453, 460 (9th Cir. 2001);
26 Cooper v. Sullivan, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989).  Here,
27 the ALJ found:
28 //

>     Prior to July 31, 2002, [plaintiff] had, and never lost for any significant period of time, the [RFC] to lift or carry twenty pounds occasionally and ten pounds frequently; stand or walk four hours per eight-hour workday; and sit six hours per eight-hour workday.  He could occasionally stoop and bend, but he could perform no significant climbing, balancing, kneeling, or crouching.  He needed to alternate sitting and standing as needed, and he could not operate motorized equipment at work because of his alcohol abuse.

A.R. 472.  However, plaintiff contends the ALJ's decision is not supported by substantial evidence because the ALJ failed to properly consider the opinion of the unidentified physician.[7]

The medical opinions of treating physicians are entitled to special weight because the treating physician "is employed to cure and has a greater opportunity to know and observe the patient as an individual."  Sprague v. Bowen, 812 F.2d 1226, 1230 (9th Cir. 1987); Morgan v. Comm'r of the Soc. Sec. Admin., 169 F.3d 595, 600 (9th Cir. 1999).  Therefore, the ALJ must provide clear and convincing reasons for rejecting the uncontroverted opinion of a treating physician, Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995), and "[e]ven if [a] treating doctor's opinion is contradicted by another doctor, the ALJ

---

[7] Plaintiff's attorney has not further identified this physician, whose signature is illegible.  See Jt. Stip. at 13:14-15:26 (plaintiff's attorney erroneously refers to this physician as a "State Agency physician").  However, the Commissioner assumes this physician is a treating physician, Jt. Stip. at 16 n.8, and for purposes of this opinion only, the Court will likewise assume the physician is a treating physician.

12

1  may not reject this opinion without providing 'specific and legitimate
2  reasons' supported by substantial evidence in the record." Reddick,
3  157 F.3d at 725; Rollins v. Massanari, 261 F.3d 853, 856 (9th Cir.
4  2001).

6      In assessing a claimant's application for disability benefits, an
7  ALJ need not set forth verbatim every statement a physician makes;
8  rather, the ALJ need only discuss evidence that is significant and
9  probative of a claimant's disability claim. Howard v. Barnhart, 341
10 F.3d 1006, 1012 (9th Cir. 2003); Vincent v. Heckler, 739 F.2d 1393,
11 1394-95 (9th Cir. 1984). Here, the ALJ's decision focuses on whether
12 plaintiff was disabled prior to July 31, 2002, since there was no
13 dispute that plaintiff was disabled after that date. Yet, the
14 unidentified physician's opinion of November 13, 2006, addresses only
15 plaintiff's condition at that time. In other words, the physician did
16 not offer a retrospective opinion about plaintiff's condition before
17 July 31, 2002, but rather assessed plaintiff's condition as of
18 November 2006, when plaintiff was clearly disabled. Moreover,
19 according to plaintiff's own testimony at the administrative hearing
20 of September 30, 2003, his condition significantly deteriorated in the
21 6-12 months **prior** to that hearing. A.R. 301-06. Thus, the November
22 2006 physician's opinion is simply not relevant to whether plaintiff
23 was disabled prior to July 31, 2002, and, as such, "the ALJ's failure
24 to discuss th[e] [opinion] was not error." Howard, 341 F.3d at 1012;
25 Vincent, 739 F.2d at 1394-95.

**V**

28     At Step Five, the burden shifts to the Commissioner to show the

13

claimant can perform other jobs that exist in the national economy. Hoopai v. Astrue, 499 F.3d 1071, 1074-75 (9th Cir. 2007); Widmark v. Barnhart, 454 F.3d 1063, 1069 (9th Cir. 2006). To meet this burden, the Commissioner "must 'identify specific jobs existing in substantial numbers in the national economy that [the] claimant can perform despite [his] identified limitations.'" Meanel v. Apfel, 172 F.3d 1111, 1114 (9th Cir. 1999) (quoting Johnson v. Shalala, 60 F.3d 1428, 1432 (9th Cir. 1995)). There are two ways for the Commissioner to meet this burden: "(1) by the testimony of a vocational expert, or (2) by reference to the Medical Vocational Guidelines ["Grids"] at 20 C.F.R. pt. 404, subpt. P, app. 2."[8] Tackett v. Apfel, 180 F.3d 1094, 1099 (9th Cir. 1999); Widmark, 454 F.3d at 1069. However, "[w]hen [the Grids] do not adequately take into account [a] claimant's abilities and limitations, the Grids are to be used only as a framework, and a vocational expert must be consulted." Thomas v. Barnhart, 278 F.3d 947, 960 (9th Cir. 2002); Widmark, 454 F.3d at 1069.

Hypothetical questions posed to a vocational expert must consider all of the claimant's limitations, Thomas, 278 F.3d at 956; Lewis v.

---

[8] The Grids are guidelines setting forth "the types and number of jobs that exist in the national economy for different kinds of claimants. Each rule defines a vocational profile and determines whether sufficient work exists in the national economy. These rules represent the [Commissioner's] determination, arrived at by taking administrative notice of relevant information, that a given number of unskilled jobs exist in the national economy that can be performed by persons with each level of residual functional capacity." Chavez v. Dep't of Health & Human Servs., 103 F.3d 849, 851 (9th Cir. 1996) (citations omitted).

14

1  Apfel, 236 F.3d 503, 517 (9th Cir. 2001), and "[t]he ALJ's depiction
2  of the claimant's disability must be accurate, detailed, and supported
3  by the medical record."  Tackett, 180 F.3d at 1101.  Here, at the
4  hearing on July 30, 2003, the ALJ and vocational expert Corrine Porter
5  engaged in the following colloquy:

7  [ALJ]:     Oh, let's suppose that there's an individual who's 58 years
8             old, has an 8th grade education and is limited to walking
9             and standing no more than two hours out of eight, would have
10            to use a cane to help walk . . . or had to lean on things,
11            could sit – in the walking and stand[ing] it would be more
12            than two hours out of eight, sitting, six hours out of eight
13            with normal breaks, but [would] need to have a sit/stand
14            option.  Lifting and carrying would be limited [to] 20
15            pounds occasionally, 10 pounds frequently.  Can only
16            occasionally stoop and bend, can't climb, balance, work at
17            heights or around unprotected machinery and would have to
18            lie down during lunch break.  With those limitations could
19            someone perform any of the [plaintiff's] prior occupations?
20 [VE]:      No, I don't believe so.
21                              *   *   *
22 [ALJ]:     Okay.  I'm curious to know . . . there's no security guard
23            jobs in a booth that could be done with those limitations?
24 [VE]:      I think that the two out of eight is limiting, it's too
25            limited.  Typically I take the opinion of a third or a half
26            of the workday one could be a gate guard or working . . . on
27            a construction site, you know, walking the perimeter.  But I
28            don't think two out of eight is enough –

```
1  [ALJ]:    A fourth of the time's not enough?  A third of the time
2            would be enough?
3  [VE]:     I – that's what I believe.
4  [ALJ]:    And if it were a third of the time that would be – would –
5            what would the job be?  A gate guard?
6  [VE]:     It would be a gate guard and then a security guard with
7            eroded numbers.
8  [ALJ]:    And that's consistent with the [Dictionary of Occupational
9            Titles ("DOT")[9]]?
10 [VE]:     Yes.
```

A.R. 298-99 (footnote added).[10]  Based on this testimony, the ALJ found at Step Five that plaintiff could perform a significant number of jobs in the national economy and, thus, was not disabled prior to July 31, 2002.  A.R. 475-76.  However, plaintiff contends the Step Five determination is not supported by substantial evidence because the ALJ did not include in his hypothetical question to the vocational expert that plaintiff could not operate motorized equipment because of his alcohol abuse.

   Plaintiff's argument is without merit since the ALJ's failure to include this limitation is his hypothetical question to the vocational

---

[9]  The DOT is the Commissioner's primary source of reliable vocational information.  Johnson, 60 F.3d at 1434 n.6.

[10]  At the hearing on May 6, 2003, vocational expert Sandra Fioretti testified in response to the same hypothetical question that an individual with plaintiff's limitations could perform 25% of security guard jobs, 1450 jobs regionally and 20,000 jobs nationally.  A.R. 275-76.

1 expert was harmless since the vocational expert identified jobs
2 plaintiff could perform that are not inconsistent with the inability
3 to operate motorized equipment; thus, the omission was inconsequential
4 to the ultimate nondisability determination. Burch v. Barnhart, 400
5 F.3d 676, 679 (9th Cir. 2005). Specifically, the omission did not
6 effect the vocational expert's testimony that plaintiff can perform
7 the job of gate guard (DOT no. 372.667-030), which is described, as
8 follows:

> Guards entrance gate of industrial plant and grounds, warehouse, or other property to control traffic to and from buildings and grounds: Opens gate to allow entrance or exit of employees, truckers, and authorized visitors. Checks credentials or approved roster before admitting anyone. Issues passes at own discretion or on instructions from superiors. Directs visitors and truckers to various parts of grounds or buildings. Inspects outgoing traffic to prevent unauthorized removal of company property or products. May record number of trucks or other carriers entering and leaving. May perform maintenance duties, such as mowing lawns and sweeping gate areas. May require permits from employees for tools or materials taken from premises. May supervise use of time clocks for recording arrival and departure of employees [TIMEKEEPER (clerical) 215.362-022]. May answer telephone and transfer calls when switchboard is closed. When stationed at entrance to restricted area, such as explosives shed or research laboratory, may be designated Controlled-Area Checker (any

industry).

U.S. Dep't of Labor, Dictionary of Occupational Titles, 268 (4th ed. 1991).[11] Nor would the omission effect the vocational expert's conclusion that plaintiff can perform security guard jobs (DOT no. 372.667-034), since this position is described as follows:

> Guards industrial or commercial property against fire, theft, vandalism, and illegal entry, performing any combination of following duties: Patrols, periodically, buildings and grounds of industrial plant or commercial establishment, docks, logging camp area, or work site. Examines doors, windows, and gates to determine that they are secure. Warns violators of rule infractions, such as loitering, smoking, or carrying forbidden articles, and apprehends or expels miscreants. Inspects equipment and machinery to ascertain if tampering has occurred. Watches for and reports irregularities, such as fire hazards, leaking water pipes, and security doors left unlocked. Observes departing personnel to guard against theft of company property. Sounds alarm or calls police or fire department by telephone in case of fire or presence of unauthorized persons. Permits authorized persons to enter property. May register at watch stations to record time of

---

[11] Although plaintiff argues that a gate guard **may** be required to "perform maintenance duties, such as mowing lawns and sweeping gate areas[,]" this does not mean that a gate guard is required to operate motorized equipment.

18

       inspection trips.  May record data, such as property damage, unusual occurrences, and malfunctioning of machinery or equipment, for use of supervisory staff.  May perform janitorial duties and set thermostatic controls to maintain specified temperature in buildings or cold storage rooms. May tend furnace or boiler.  May be deputized to arrest trespassers.  May regulate vehicle and pedestrian traffic at plant entrance to maintain orderly flow.  May patrol site with guard dog on leash.  May watch for fires and be designated Fire Patroller (logging).  May be designated according to shift worked as Day Guard (any industry); area guarded as Dock Guard (any industry); Warehouse Guard (any industry); or property guarded as Powder Guard (construction).  May be designated according to establishment guarded as Grounds Guard, Arboretum (any industry); Guard, Museum (museums); Watchguard, Racetrack (amuse. & rec.); or duty station as Coin-Vault Guard (any industry). May be designated Guard, Convoy (any industry) when accompanying or leading truck convoy carrying valuable shipments. May be designated: Armed Guard (r.r. trans.); Camp Guard (any industry); Deck Guard (fishing & hunt.; water trans.); Night Guard (any industry); Park Guard (amuse. & rec.).

U.S. Dep't of Labor, <u>Dictionary of Occupational Titles</u>, 269 (4th ed. 1991).[12]

---

[12] A security guard is not required to drive a motorized vehicle to patrol buildings and grounds, especially where, as here, the vocational expert testified that plaintiff's

19

1    Moreover, the ALJ's hypothetical question to the vocational
2 expert included an analogous limitation – that plaintiff could not
3 work around unprotected machinery – which adequately encompassed
4 plaintiff's limitations, cf. Roe v. Chater, 92 F.3d 672, 676 (8th Cir.
5 1996) ("While the hypothetical question must set forth all the
6 claimant's impairments, it need not use specific diagnostic or
7 symptomatic terms where other descriptive terms can adequately define
8 the claimant's impairments." (citation omitted)), especially since
9 the ALJ found plaintiff could not operate motorized equipment at work
10 due only to his continued alcohol abuse, and not due to any physical
11 or mental impairment either deriving from, or apart from, such abuse.
12 A.R. 472; see also A.R. 275 (medical expert Dr. Landau testified
13 plaintiff would not be restricted from operating motorized equipment
14 if he did not consume alcohol).  For all these reasons, the ALJ's Step
15 Five determination is supported by substantial evidence.

**ORDER**

   IT IS ORDERED that: (1) plaintiff's request for relief is denied;
and (2) the Commissioner's decision is affirmed, and Judgment shall be
entered in favor of defendant.

DATE: August 11, 2008              /s/ ROSALYN M. CHAPMAN
                                   ROSALYN M. CHAPMAN
                                   UNITED STATES MAGISTRATE JUDGE

---

limitations would erode the security guard jobs available to
limit plaintiff to "working . . . on a construction site . . .
***walking*** the perimeter."  A.R. 299 (emphasis added).

R&R-MDO\03-1241.MDO
8/11/08